# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:14-CR-38-TLS |
| | ) | |
| MIGUEL VERDUZCO-VELAZQUEZ | ) | |

## OPINION AND ORDER

This matter is before the Court on the Defendant's Motion to Suppress Evidence [ECF No. 22], filed on November 12, 2014. The Defendant seeks to suppress evidence law enforcement officers seized following a traffic stop on August 14, 2014, and any statements made by the Defendant following the seizure. For the reasons set forth in this Opinion and Order, the Court denies the Defendant's Motion.

## BACKGROUND

By way of a two-count Indictment filed on September 24, 2014, the Government charges that, on or about August 14, 2014, the Defendant (1) knowingly and intentionally possessed with intent to distribute one kilogram or more of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1); and (2) was found in the United States after having been deported and removed therefrom on or about June 22, 2011, subsequent to a conviction for an aggravated felony, in violation of 8 U.S.C. § 1326(a) and (b)(2).

After the Defendant filed the Motion to Suppress Evidence on November 12, 2014, the Court conducted evidentiary hearings on July 7 and July 13, 2015. The Defendant was present and represented by Attorney Michelle F. Kraus; and the Government was represented by Assistant United States Attorney Anthony W. Geller. The Court granted the Defendant's motion

to separate the witnesses, and then proceeded to receive testimony from Allen County Police Department (ACPD) Officers James A. Gasvoda, Chris Kramer, and Jeffery Smallwood; City of Fort Wayne Police Department (FWPD) Officer Darrin Strayer; Indiana State Police Officer Adalberto Martinez; and FBI Special Agent James Keszei. The Court took the Motion under advisement and gave the parties additional time to file briefs. The Defendant filed a Brief in Support of the Motion to Suppress [ECF No. 47] on December 3, 2015; the Government filed a Response [ECF No. 48] on January 4, 2016; and the Defendant did not file a Reply. This matter is now fully briefed and ripe for ruling.

**FINDINGS OF FACT**

Upon consideration of the credibility of the witnesses and the examination of the evidence, the Court makes the following findings of fact.

In 2014, the FBI Safe Streets Task Force (SSTF) was investigating the criminal drug activity of Steve Smith. On August 12, 2014, a recorded meeting took place between Smith and an undercover FBI agent, whereby the parties coordinated the purchase of two kilograms of heroin for $150,000. Immediately following the meeting, FWPD Officer Darrin Strayer (also an SSTF member) followed Smith to a Panda Express restaurant at the Jefferson Pointe Shopping Center in Fort Wayne. Officer Strayer testified that he observed a male exit Smith's truck and enter the driver's seat of a silver Honda Accord, which was parked next to Smith's vehicle. According to Officer Strayer, the male—who he identified in Court as the Defendant—was white, approximately 5 feet 8 inches in height, with black hair containing "a little" gray and a full beard. (Hr'g. Tr. 76, July 7, 2015, ECF No. 46.)

2

On August 14, 2014, Smith and the undercover agent met to consummate the drug transaction. After discussing logistics, Smith directed the undercover agent—who possessed $150,000 of show money—to follow him to see "the product." (Hr'g. Tr. 8, July 13, 2015, ECF No. 45.) The parties reconvened at Smith's residence, where Smith showed the undercover agent a kilogram of heroin. Soon thereafter, the undercover agent signaled law enforcement, and Smith was arrested. A search of Smith's residence resulted in the seizure of one kilogram of heroin and five pounds of marijuana.

In a recorded interview following his arrest, Smith admitted to coordinating the deal with the undercover agent for two kilograms of heroin. However, Smith said he wanted to see if the transfer of the first kilogram was successful before contacting his supplier—who he identified as "Chalo"—for the second kilogram. Smith described Chalo as a Hispanic male, "shorter" in height, with dark hair that has "a little bit of gray in it" and a beard "cut low into more of a goatee." (*Id.* at 11.) Smith informed law enforcement officers that on August 12, 2014, he made a partial payment of $10,000 to Chalo for heroin; that Chalo drives a silver Honda four-door; and that he typically meets Chalo at locations around Jefferson Pointe, including Panda Express and Lowe's. Smith also said that Chalo was expecting a phone call within "an hour or two" of the arranged drug transaction with the undercover agent, so that Chalo could deliver the additional kilogram of heroin. (*Id.* at 10.)

After agreeing to cooperate with law enforcement, Smith, by way of recorded phone calls at the interview location, arranged for the delivery of the second kilogram of heroin. During one recorded call, Smith told Chalo that he needed "the other one" and that he had "ten" for Chalo from "the other one." (Gov. Ex. 4.) Smith then suggested some possible meeting locations, and

3

Chalo picked the Lowe's parking lot at Jefferson Pointe. In another recorded call, Chalo confirmed that he had "the full other one." (*Id.*) FBI Special Agent James Keszei testified that, based on his training and experience, "the other one" and "the full other one" were references to a kilogram of heroin to be supplied by Chalo at the arranged meeting.[1]

Smith, accompanied by Keszei and SSTF Officer Adalberto Martinez, went to the Lowe's parking lot, where they observed a silver Honda Accord with a temporary license plate pull into the parking lot and back up against a line of trees. Officer Martinez believed, based on his training and experience, that the positioning of the vehicle indicated the occupant's desire to survey the parking lot and conceal the rear license plate.[2] Moreover, according to Strayer, who was among several officers conducting surveillance at the Lowe's parking lot, the silver Honda "looked a lot like" the silver Honda he observed at the Panda Express on August 12, 2014. (Hr'g. Tr. 78, July 7, 2015.)

At this point, Smith was directed by law enforcement officers to devise an excuse for delaying the drug transaction, which would allow an officer to conduct a traffic stop of the silver Honda. During a recorded call, Chalo confirmed that he was present at the meeting location, and Smith informed Chalo that he was running late because he was unable to contact his "guy," or customer. (Gov. Ex. 4.) In another recorded call, Smith told Chalo that he was unable to contact his "dude, " or customer. (*Id.*) The parties then postponed the meeting, and within a minute or

---

[1]Special Agent Keszei has served as an FBI Special Agent for approximately 13 years, and as a member of the Fort Wayne SSTF for approximately six years. Keszei's work with SSTF has entailed large-scale drug investigations, including cases involving large quantities of heroin.

[2]Officer Martinez has served with the Indiana State Police for nearly 13 years and as a member of the Fort Wayne SSTF for five years. Officer Martinez's experience with the Indiana State Police includes drug interdiction.

4

two, the silver Honda left the Lowe's parking lot.

ACPD Officer James A. Gasvoda—who was uniformed, driving a marked police car, and in radio contact with surveillance officers—was parked near the Lowe's parking lot. At the request of the SSTF officers, Officer Gasvoda followed the silver Honda to conduct the traffic stop. According to Officer Gasvoda, although he was not directly behind the silver Honda, he observed two separate traffic violations:

> [A]s the [silver Honda] passed the McDonald's . . . just before Covington Road on Jefferson, I observed it move from the left lane to the right lane without a signal. And then immediately afterward, I observed it—just a few more feet ahead . . . turn right onto Covington Road without a signal.

(Hr'g. Tr. 12, July 7, 2015.) Officer Gasvoda said he heard other law enforcement officers call out the same traffic violations over the radio. SSTF Officer Jeffery Smallwood, who was driving behind Officer Gasvoda, also testified that he observed the silver Honda changing lanes from left to right without using a turn signal.

After observing the second traffic violation, Officer Gasvoda activated his police lights and conducted a traffic stop. The Defendant, who was the sole occupant in the silver Honda, pulled over into the entrance of a cemetery. Officer Gasvoda approached the vehicle and informed the Defendant of the traffic violations (i.e., violations for an "unsafe lane change and failure to signal a turn."). (*Id.* at 13.)[3] The Defendant did not deny the traffic violations. He was also unable to produce a driver's license; and instead, produced a voter registration card from Mexico. Officer Gasvoda testified that a short conversation ensued, whereby the Defendant admitted that he was not a United States

---

[3]Officer Gosvoda testified that he and the Defendant communicated in English, and that they were able to communicate "fairly well." (Hr'g. Tr. 32, July 7, 2015.)

citizen, and that he was not the owner of the silver Honda. During this conversation, Officer Gasvoda observed the Defendant exhibit "overly nervous" behavior and poor eye contact. (*Id.* at 15.) He also observed roughly a dozen air fresheners on the turn signal column of the vehicle. Based on his training and experience, Officer Gasvoda believed that the air fresheners were an attempt to mask the odor of narcotics.[4]

Then, in compliance with Officer Gasvoda's request, the Defendant turned off the vehicle and relinquished his keys. Around this time, ACPD Officer Chris Kramer (a K-9 handler) arrived at the scene with his dog. While Officer Gasvoda performed a records check on the Defendant's purported name (as provided on his voter registration card from Mexico), the dog alerted to the presence of narcotics within the silver Honda. The Defendant then exited the vehicle and fled through the cemetery. After a short pursuit, the Defendant was arrested and the silver Honda was towed and inventoried. A search of the vehicle resulted in the seizure of, among other things, one kilogram of heroin, located in the rear passenger area.

Officer Martinez, who is fluent in both English and Spanish, listened to multiple recorded telephone calls made from the jail through the Defendant's personal identification number (PIN) account. While listening to these calls, Officer Martinez heard mention of the Defendant by his name and nickname (i.e., Chalo), along with a discussion of the facts surrounding the Defendant's case. Officer Martinez recognized the relevant voice on the calls as the voice of the Defendant, based on a subsequent interview between Officer Martinez and the Defendant that lasted at least an hour. During one of these recorded calls, the Defendant admitted to his failure

---

[4]Officer Gasvoda has served in the ACPD for 22 years, which includes one year as an undercover officer for the Drug Enforcement Administration (DEA) and several years in the ACPD's Vice Narcotics Division.

to use a turn signal prior to the traffic stop.

**ANALYSIS**

The Fourth Amendment protects the right of "the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When police officers stop an automobile and detain the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996).

The Defendant argues that the evidence against him should be suppressed because law enforcement officers lacked probable cause to conduct a traffic stop. *See United States v. Conrad*, 673 F.3d 728, 732 (7th Cir. 2012) ("The Supreme Court has long recognized the need to exclude evidence obtained in violation of the Constitution's protections.") (citation omitted). The Government counters that the officers had probable cause to conduct a traffic stop because the Defendant committed two traffic violations. Alternatively, the Government argues that the traffic stop was lawful because the officers had reasonable suspicion to believe that the Defendant was engaged in criminal drug activity.

**A.     Traffic Violations**

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810; *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he

may, without violating the Fourth Amendment, arrest the offender."). Probable cause exists where the officer reasonably assesses the facts and concludes that a traffic violation occurred. *United States v. Muriel*, 418 F.3d 720, 725 (7th Cir. 2005). Any ulterior motive an officer may have for making the stop is irrelevant. *United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003) (citing *Whren*, 517 U.S. at 813).

At the evidentiary hearing on July 7, Officer Gasvoda testified that, prior to conducting a traffic stop, he observed the Defendant change lanes and make a right turn without using a signal—each of which constitutes a traffic violation under Indiana law. *See* Ind. Code § 9-21-8-24 (A driver may not "turn a vehicle from a direct course upon a highway; or . . . change from one (1) traffic lane to another . . . [without] giv[ing] an appropriate stop or turn signal . . . if any other vehicle may be affected by the movement."). The Defendant argues, however, that the testimony of Officer Gasvoda (along with the testimony of Officers Strayer and Smallwood) lacks credibility due to "contradict[ions] . . . about what was seen and said by each other." (Def.'s Br. 4.) Specifically, the Defendant points to Gasvoda's statement that "more than one" officer called out a traffic violation; and contrasts it with Smallwood's statement that only Gasvoda called out a traffic violation (Hr'g. Tr. 91, July 7, 2015), and Strayer's statement that he "believe[d] it was Task Force Officer Smallwood" who called out the traffic violation, *id.* at 84. The Defendant also notes that Officer Strayer did not observe the Defendant commit a traffic offense.

Notwithstanding the above testimony, the Defendant has not pointed to any evidence contradicting the central allegation in this matter: that Officer Gasvoda observed the Defendant commit a signal violation prior to initiating the traffic stop. Officer Gasvoda's testimony is not

8

only corroborated by Officer Smallwood, who testified to observing the Defendant change lanes without using a signal; but also by the Defendant himself, who never denied the signal violations upon being stopped, and more critically, admitted to committing a signal violation during a recorded phone call in jail. Moreover, despite their varied recollections as to what was said over police radio, all three officers agreed that a traffic violation was, in fact, called out over police radio. As such, the cited discrepancies are minor in nature, and do little to undermine the credibility of the Government's witnesses. *United States v. Abernathy*, 258 Fed. App'x 903, 906 (7th Cir. 2007) (unpublished table decision) ("[M]inor errors and inconsistencies in witness testimony . . . do not prevent a district court from finding the witness credible.") (citing *United States v. Jensen*, 169 F.3d 1044, 1047–48 (7th Cir. 1999) ("Witnesses are not incredible as a matter of law simply because they have been impeached on trivial, irrelevant matters.")); *see also United States v. Wendt*, 465 F.3d 814, 817 (7th Cir. 2006).[5]

In light of the credible testimony presented as to the Defendant's observed traffic violations, the Court finds that law enforcement officers had an "objectively reasonable basis to believe a traffic law had been violated," *United States v. Reaves*, 796 F.3d 738, 741 (7th Cir.

---

[5]In his brief, the Defendant notes that Officer Gasvoda's in-car video does not clearly show the Defendant committing a signal violation. But at the evidentiary hearing, Officer Gasvoda offered a reasonable explanation as to why the in-car camera failed to offer corroboration:

> [Government Counsel:] Can you see [the traffic violations] on your in-car video?
> [Officer Gasvoda:] Not very well.
> [Government Counsel:] Okay. Why is that?
> [Officer Gasvoda:] Because the dimension of the camera is 2-D and the positioning of the camera is a different perspective and viewpoint than what I have behind the driver's wheel. Plus, I already know where the vehicle is and I'm watching it, so I know exactly what I'm looking for.

(Hr'g. Tr. 13, July 7, 2015.)

9

2015). Accordingly, the initial traffic stop of the Defendant was lawful under the Fourth Amendment.

B.      **Criminal Drug Activity**

Aside from the Defendant's traffic violations, law enforcement officers were also permitted to conduct a traffic stop because they had reasonable suspicion to believe that the Defendant was engaged in criminal drug activity.

Police officers are justified in conducting a brief investigatory stop if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "A *Terry* investigative stop 'gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity.'" *United States v. Bullock*, 632 F.3d 1004, 1014–15 (7th Cir. 2011) (quoting *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995)). The "reasonable suspicion" test is objective and based on the totality of the circumstances known to the officer at the time of the stop. *United States v. Amaral-Estrada*, 509 F.3d 820, 827 (7th Cir. 2007). Although reasonable suspicion requires more than a mere "hunch," it is a measure of suspicion less demanding than that required for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). It is a "commonsense, nontechnical" concept dealing with "the factual and practical consideration of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (internal quotations marks omitted).

Here, the information that led to the traffic stop of the Defendant was provided, in large

part, by an identified informant (Steve Smith) who agreed to cooperate with law enforcement after admitting to coordinating the sale of heroin with an undercover agent. "When a single informant provides the tip that brought police to a *Terry* stop, [a court] looks to the amount of information given, the degree of reliability, and the extent that the officers can corroborate some of the informant's information." *United States v. Booker*, 579 F.3d 835, 838–39 (7th Cir. 2009) (citation and internal quotations marks omitted); *United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir. 1995) ("Reliability may be shown . . . through independent confirmation or personal observation by the police, or by other methods."); *see also Booker*, 579 F.3d at 838–39 (noting that an identified witness "should be given more weight" than an anonymous witness) (citations omitted).

As detailed in the Government's brief, the information provided by Smith—which was corroborated by independent surveillance and recorded phone calls—provided ample basis for a *Terry* stop of the Defendant. In a recorded interview following his arrest, Smith stated that his supplier (i.e., Chalo) was expecting a phone call within "an hour or two" after the drug transaction with the undercover agent, so that Chalo could deliver the additional kilogram of heroin. This statement was corroborated by Smith's arranged drug transaction with the undercover agent for two kilograms of heroin and the seizure of only one kilogram of heroin at Smith's residence. During the interview, Smith also explained that he met Chalo at a Panda Express on August 12, 2014, for the purpose of paying Chalo $10,000 for a drug-related debt. This information, along with Smith's descriptions of Chalo and his vehicle ("a silver Honda four-door"), were all corroborated by Officer Strayer's independent surveillance.

Additionally, in a series of recorded calls between Smith and Chalo, the parties arranged

11

the meeting at Jefferson Pointe—a location previously identified by Smith as a typical meeting spot for him and Chalo—and made several statements that Special Agent Keszei believed were references to the sale of a kilogram of heroin. *See* Gov. Ex. 4 (Smith told Chalo that he needed "the other one" and that he had "ten" for Chalo from "the other one"); *id.* (Chalo confirmed that he had "the full other one"); *see United States v. Burnside*, 588 F.3d 511, 518 (7th Cir. 2009) ("In forming a reasonable belief that a drug transaction occurred, [police] were permitted to view the events through the prism of their training and experience."). Then, upon arrival at the Lowe's parking lot, Special Agent Keszei and Officer Martinez observed a silver Honda with a temporary rear license plate pull into the parking lot and back up against a line of trees. Based on his training and experience, Officer Martinez believed the positioning of the silver Honda indicated the occupant's desire to survey the parking lot and conceal the rear license plate. Strayer also testified that the silver Honda in the Lowe's parking lot "looked a lot like" the silver Honda he observed at the Panda Express on August 12, 2014. Chalo confirmed (via another recorded call) that he was present in the Lowe's parking lot. And within a minute or two after the meeting between Smith and Chalo was postponed, the silver Honda left the parking lot and was stopped soon thereafter.

Again, given the facts above—including the reliability of Smith's information and the high degree of corroboration obtained through independent surveillance and personal observation, *United States v. Navarro*, 90 F.3d 1245, 1253 (7th Cir. 1996)—law enforcement officers had reasonable suspicion to believe that the driver of the silver Honda in the Lowe's parking lot (i.e., the Defendant) was engaged in the sale of heroin with the identified informant. *See United States v. Huebner*, 356 F.3d 807, 813–815 (7th Cir. 2004) (finding probable cause

when a well-corroborated informant set up a controlled drug buy which resulted in the stop and arrest of a suspect who was on the way to the deal). As such, the officers' reasonable suspicion as to the Defendant's criminal drug activity represented an independent justification for the traffic stop at issue.[6]

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendant's Motion to Suppress Evidence [ECF No. 22]. A Final Pretrial Conference is **SET** for February 22, 2016, at 3:00 PM before Judge Theresa L. Springmann. The Court will initiate the call. A five (5)-day Jury Trial is **SET** for March 8, 2016, at 8:30 AM before Judge Theresa L. Springmann. The deadline for parties to file a motion to continue trial-related deadlines and the jury trial date is February 19, 2016.

SO ORDERED on February 16, 2016.

                                            s/ Theresa L. Springmann
                                           THERESA L. SPRINGMANN
                                           UNITED STATES DISTRICT COURT

---

[6]Although the Defendant asserted in his Motion to Suppress Evidence that "[t]he scope and duration of the stop were unreasonable and violated the Fourth Amendment" (Def.'s Mot. 1); *see Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution"), the Defendant appears to have abandoned this argument in his brief. Nevertheless, the Court finds that the scope and duration of the traffic stop—which lasted less than nine minutes before the Defendant fled on foot—were reasonable in light of the facts presented.